

FILED

03/21/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 14, 2017 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEE WILLIAMS

**Appeal from the Criminal Court for Davidson County**
**No. 2014-D-3138    J. Randall Wyatt, Jr., Judge**

_____

**No. M2016-00568-CCA-R3-CD**

_____

Defendant, Christopher Lee Williams, was convicted of reckless endangerment, aggravated kidnapping, and domestic assault. Defendant raises the following issues on appeal: (1) whether dual convictions for aggravated kidnapping resulting in bodily injury and domestic assault based on bodily injury are proper, and (2) whether the trial court failed to consider a statutory mitigating factor in fashioning Defendant's sentence. After a review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Joshua L. Brand (on appeal), Jamaal L. Boykin and Kyle Parks (at trial), Nashville, Tennessee, for the appellant, Christopher Lee Williams.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Defendant was indicted by the Davidson County Grand Jury in October of 2014 for one count of aggravated assault by strangulation, one count of especially aggravated kidnapping with serious bodily injury, and one count of domestic assault with bodily

injury after Defendant and his live-in girlfriend, Jessica Head, got into an argument on September 8, 2014.

At trial, Ms. Head explained that she and Defendant started dating approximately eight years prior to the incident. The couple met at Nashville State College where they were taking classes. Ms. Head moved in with Defendant and his parents shortly after they started dating. A few months later, the couple moved in to their own apartment, and they were living together at the time of the incident. Ms. Head worked as a server at Logan's Roadhouse Restaurant. Ms. Head acknowledged that she had a prior conviction for theft and that she was placed on probation as a result of that conviction.

The morning prior to the incident, Ms. Head worked at Logan's from approximately 10:00 a.m. to 5:00 p.m. After work, Ms. Head went home and "collected laundry." She was at the apartment for "about an hour and [a] half" and left with her friend Cheryl Witherow to do laundry at another location because she did not like the laundry facilities at the apartment complex. Ms. Head was gone for between two to two and a half hours before returning home to "drop the laundry off around ten o'clock that night." Defendant was at the apartment when she returned. Ms. Head again left with Ms. Witherow "because she had to go pick a friend up from [their] job and take her home and she didn't want to ride by herself at night."

Ms. Head eventually made it back to the apartment around 1:00 or 1:30 a.m. Defendant was "very upset and hostile" and accused Ms. Head "of cheating on him." He called her a "whore and a slut." Ms. Head did not want to fight with Defendant so she "sat down on the couch and just agreed with him." When Ms. Head sat down, she "stuffed the keys inside the couch" because she did not want Defendant to take the car, which they shared. As she did so, she felt something in the couch. She pulled a letter "in a female's handwriting" out from between the couch cushions.[1] Ms. Head "started reading the letter" and asked Defendant about who wrote the letter. She called him a "Bitch." Defendant "snapped and he grabbed [Ms. Head] by the hair on [her] head." Defendant "grabbed [her] with two hands full of [her] hair and threw [her] onto the ground, right in front of the couch." Then he repeatedly slammed Ms. Head's head onto the carpet, telling her to read the letter. Defendant claimed that the letter was written for someone else. Defendant eventually got on top of Ms. Head, kneeling on top of her body and pushing he face into the carpet so that she felt his entire body weight.

Ms. Head was unable to defend herself because she "couldn't move" with Defendant on top of her. At one point, she was in a fetal position and Defendant "had his

---

[1] An incident report completed by Officer Joshua Dickall (which was never shown to the victim) indicated that Ms. Head reported that the letter was found on a table. During cross-examination, Ms. Head maintained that she found the letter in the couch.

knees on [her] side and both of his hands on top and on the side of [her] head pushing [her] into the floor." Ms. Head was not able to breathe "normally" and could not take a "full breath" for approximately "3 to 5 minutes." Defendant hit her in the left side of the head with his closed fist.

Defendant finally allowed Ms. Head to get up from the floor. She went upstairs "to look in the mirror to see what damage had been done and [she] noticed that [her] eyes were swollen like to the point where [she] could barely recognize [her] nose." Ms. Head was spitting blood, had carpet burn on her face, and had busted blood vessels in one of her eyes. She thought that she needed to go to the hospital because she suspected her nose was broken. Ms. Head stayed upstairs for approximately fifteen minutes. When she went downstairs she told Defendant that she wanted to go to the hospital. Defendant told her she was "not going anywhere." Ms. Head claimed that she tried to leave through the front door six or seven times and the back door several times but Defendant refused to let her leave, using force to "pull [her] away from the doors." Ms. Head recounted the episode as follows:

> I got my hand on the doorknob I think maybe once, but every[] [time] he would grab my shirt or he would grab my arm or he would grab my shoulder, and he would throw me to the floor, into the wall, or onto the couch or just to get me away from the door, so I would try the back door.

Defendant repeatedly told Ms. Head that she was not leaving and that she was not allowed to go anywhere. Defendant even told her "he could kill [her] and get away with it." Ms. Head explained that she was "very upset" at this point. She tried "to make any kind of noise" so that "hopefully . . . the neighbors [would] wake up and call the police for a noise complaint."

Around three or four in the morning, Ms. Head gave up trying to leave. She was "in pain" and "tired." Ms. Head told Defendant that she wanted to go get a cigarette, intending to leave by herself. Instead, Defendant drove her to an open gas station and parked right in front of the walk-up window. At that point, Ms. Head claimed that she "couldn't run if [she] wanted to" and did not try to alert the clerk at the gas station because she did not think it would help. The couple returned to the apartment where Defendant helped Ms. Head find her cell phone and put the phone on the charger. Ms. Head ended up falling asleep on the couch. The next morning, she awoke to Defendant rubbing her feet.

When she awoke, Ms. Head told Defendant that she wanted him to move out. Defendant agreed but asked her to give him until later in the month. Ms. Head agreed and told Defendant she was leaving to pick up her paycheck and would return later.

Defendant apologized for the fight and let Ms. Head take a shower. She left after she took the shower and did not return.

When Ms. Head arrived at Logan's to pick up her paycheck, her manager Kevin Holland met her outside. Mr. Holland encouraged Ms. Head to go to the hospital. Ms. Head left the restaurant to cash her check and to pay a few of her bills. She eventually returned to Logan's. Ms. Head told her coworkers that she wanted to go to the hospital. She was accompanied by coworkers Kari Brecht and Ms. Witherow. Pictures were taken of Ms. Head's injuries at the hospital. According to Ms. Head, they "do not accurately depict the injuries" because at the time they were taken she was wearing makeup. Both Mr. Holland and Ms. Brecht testified at trial that Ms. Head's injuries appeared worse in person than as depicted in the photographs taken at the hospital.

At the hospital, Ms. Head spoke with several police officers, including Officer Joshua Dickall. He testified that he completed an incident report but that Ms. Head would have signed the report prior to his completion of the narrative of the incident. In other words, Ms. Head did not review Officer Dickall's version of the events for accuracy before she signed the report. The incident report does not indicate that Ms. Head was ever unable to breathe or that she was slammed into a wall. Officer Dickall initially listed the offense as domestic assault with bodily injury but amended it to aggravated assault at the request of his supervisor.

At the hospital, Ms. Head did not tell officers that Defendant "strangled" her during the fight because she thought that being strangled meant that someone had to put their hands around your throat. Ms. Head testified that she learned about the actual definition of strangulation from the Commissioner who swore out the warrants against Defendant. Officer Austin Kendrick was responsible for preparing warrants on behalf of Ms. Head. He did not have a copy of Officer Dickall's report when he prepared the warrants. He arrived at the hospital around 3:00 p.m. in the afternoon and went to the Commissioner sometime around 8:30 p.m. Ms. Head informed Officer Kendrick that she was face-down in the carpet and that she was unable to breathe during this time. Officer Kendrick did not recall a discussion regarding strangulation.

Ms. Head described her injuries as "excruciating" and "painful." She had pain in her neck, tailbone, and face. She felt like she had been in a car wreck, she "could barely turn [her] neck," and it was "very painful to walk." She was "embarrassed" to go to work with a "black eye and a swollen nose." Ms. Head was unable to work "properly for a week or two." The pictures showed bruises on her arms, a "big scratch" along her back, a bruise on her leg, a knot on her leg, bruises on her knee, a black eye, redness in one of her eyes, and a busted lip. Ms. Head also complained of pain in her neck and tailbone.

Dr. Tom Deering from the office of the Davidson County Medical Examiner testified as a forensic pathologist. He described Ms. Head's injuries as a facial contusion, a minor closed head injury, a cervical neck strain, a bruised coccyx, and a small eye hemorrhage. The medical records did not indicate evidence of strangulation or fractures.

At the conclusion of the proof, Defendant moved for the dismissal of the especially aggravated kidnapping and assault charges on the basis that they were not separate and distinct and because there was not sufficient evidence of serious bodily injury. The trial court ruled that those were questions for the jury. The jury found Defendant guilty of the lesser included offense of reckless endangerment, the lesser included offense of aggravated kidnapping, and domestic assault. The trial court sentenced Defendant to an effective sentence of ten years. After the denial of a motion for new trial, Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant characterizes his first issue as a challenge to the sufficiency of the evidence with respect to his convictions for aggravated kidnapping by bodily injury and domestic assault by bodily injury.[2] Specifically, Defendant insists that dual convictions are improper because both convictions relied upon bodily injury as "the enhancing factor." The State disagrees, arguing that the State elected facts it relied upon at trial to support a conviction for each offense and that the evidence supported the convictions.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'"

---

[2] Defendant does not challenge his conviction for reckless endangerment.

*Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Id*. The standard of review is the same whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Defendant was charged with especially aggravated kidnapping and the jury found him guilty of the lesser included offense of aggravated kidnapping. In order to convict Defendant of aggravated kidnapping, the State was required to show "false imprisonment . . . [w]here the victim suffer[ed] bodily injury." T.C.A. § 39-13-304(a)(4). False imprisonment is committed when a defendant "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." T.C.A. § 39-13-302(a). To convict Defendant of domestic assault, the State was required to show that he "[i]ntentionally, knowingly or recklessly cause[d] bodily injury" to "a domestic abuse victim." T.C.A. §§ 39-13-101(a)(1) & 39-13-111(b). An assault constitutes domestic abuse if the assailant and the victim are adults "who live together." T.C.A. § 39-13-111(a)(2).

On appeal, Defendant does not challenge with any particularity the State's proof of any of the elements of the crimes for which he was convicted. Instead, the gist of the argument made by Defendant is that the victim's injuries were "clearly caused by the . . . ongoing assault, and there was no proof to support a finding that any removal or confinement beyond the assault resulted in additional bodily injury." Defendant maintains that the dual convictions for aggravated kidnapping and domestic assault violate *State v. White*, 362 S.W.3d 559, 578 (Tenn. 2012).[3]

In *White*, the Tennessee Supreme Court addressed how due process considerations affect convictions for kidnapping and an accompanying felony. In that case, the Supreme Court held:

> [T]he legislature did not intend for the kidnapping statutes to apply to the removal or confinement of a victim that is essentially incidental to an accompanying felony, such as rape or robbery. This inquiry, however, is a question for the jury after appropriate instructions, which appellate courts review under the sufficiency of the evidence standard as the due process safeguard.

---

[3] The State takes issue with Defendant's failure to use the words "violation of Double Jeopardy" and the failure to cite *State v. Watkins*, 362 S.W.3d 530 (Tenn. 2012), in his argument. We do not find this alleged deficiency fatal to our resolution of Defendant's issue on appeal as we find the issue to be one more of due process than double jeopardy.

*White*, 362 S.W.3d at 562. Under this view, the Court concluded that the legislature intended to impose a kidnapping punishment only when "the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *Id.* at 577. Consequently, the trial court must instruct the jury to determine whether the removal or confinement was essentially incidental to the accompanying felony or whether it was significant enough, standing alone, to support a conviction for kidnapping. *Id.* at 578. Such a jury instruction is necessary to afford the defendant the proper constitutional due process protection. *Id.* Often, the proof can be interpreted different ways, and therefore, whether the removal or confinement constituted substantial interference with the victim's liberty is a question of fact for the jury to resolve. *Id.* at 579. Additionally, the Supreme Court set out a suggested jury instruction to be utilized in cases where kidnapping is charged with an accompanying felony, and that instruction was later included in the Tennessee Pattern Jury Instructions. *Id.* at 580-81; 8 Tenn. Prac. Pattern Jury Instr. T.P.I.–Crim. 8.03(a).

Defendant does not dispute that the jury properly received the *White* instruction. Instead, he claims that the evidence was insufficient to support the jury's finding that the removal and confinement of Ms. Head and the accompanying bodily injury had criminal significance beyond that necessary to consummate the domestic assault with accompanying bodily injury. He claims that both convictions were based on the same bodily injury. However, Defendant's argument fails to acknowledge that the jury's determination is a question of fact, which we will not disturb on appeal. *See White*, 362 S.W.3d at 579; *Bland*, 958 S.W.2d at 659; *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). With the addition of the jury instruction, it became the jury's obligation to ensure that a criminal defendant has been afforded due process in these types of cases. *White*, 362 S.W.3d at 577. The jury is presumed to follow the trial court's instructions. *State v. Banks*, 271 S.W.3d 90, 134 (Tenn. 2008). On review, we are limited to a sufficiency of the evidence review of a properly instructed jury's assessment of the facts. *Id.* at 577-78.

By convicting the Defendant of aggravated kidnapping with accompanying bodily injury, after receiving a *White* instruction, the jury determined that the removal and confinement of Ms. Head was not essentially incidental to the offense of domestic assault. Counsel for the State explained during closing argument that the domestic assault charge was based on when "[D]efendant threw Ms. Jessica Head on to the ground and began to attack her" and that the aggravated kidnapping was based on what happened

> after that original altercation had completed and Ms. Head had gone up the stairs[,] washed her face and was upstairs for approximately 15 minutes before she came back downstairs very upset and in extreme pain and needing to go to the hospital, trying to get out of the house to go to the hospital and the defendant refusing to let her go to the hospital, by grabbing, literally grabbing her away from the door and throwing her onto

the ground; grabbing her from the door again throwing her onto the couch, throwing her into walls, every time she tried to make a run for the door so that she could get the help that she felt like she needed at that moment and then the incident continues when she then goes to the back door and tries to get out the back door, but the defendant comes and grabs her and throws her into the wall and into the ground [where she injured her coccyx and neck].

Counsel for the State went on to explain to the jury at length the requirements of the *White* instruction. *See White*, 362 S.W.3d at 580-81.

Moreover, viewing the evidence in a light most favorable to the State, the evidence supports both convictions. Defendant first assaulted Ms. Head by throwing her to the ground and hitting her in the face shortly after the argument started.[4] Ms. Head then retreated upstairs to examine her injuries. When she saw the severity of the injuries and decided that she needed medical attention, Defendant repeatedly prevented Ms. Head from leaving the apartment by grabbing her and slamming her body against walls and furniture. Therefore, we find that there is sufficient evidence from which the jury could conclude that Ms. Head's removal and confinement had criminal significance beyond that necessary to consummate the domestic assault, *see id.* at 577, and we affirm Defendant's convictions for aggravated kidnapping and domestic assault.

*Sentencing*

Defendant also challenges his sentence. Specifically, he complains that the trial court failed to consider the voluntary release of the victim as a mitigating factor. The State insists that the trial court did not abuse its discretion in sentencing Defendant to an effective sentence of ten years.

When a defendant challenges the length or manner of service of a within-range sentence, this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). This presumption applies to "within-range sentencing decisions that reflect a proper application of the purposes and principles of the Sentencing Act." *Bise*, 380 S.W.3d at 707. A trial court abuses its discretion in sentencing when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (citing *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn. 1996)). The defendant bears the

---

[4] Defendant also held Ms. Head down on the floor and pushed her face into the carpet where she was unable to breathe, forming the basis for the reckless endangerment conviction.

burden of proving that the sentence is improper.  T.C.A. § 40-35-101, Sentencing Comm'n Cmts.

In reaching its decision, the trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment.  *See* T.C.A. § 40-35-102, -103, -210(b); *see also Bise*, 380 S.W.3d at 697-98.  Additionally, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed."  T.C.A. § 40-35-103(2), (4).

This Court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute."  *Bise*, 380 S.W.3d at 709-10.  The weighing of various enhancement and mitigating factors is within the sound discretion of the trial court.  *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).

As noted by Defendant, Tennessee Code Annotated section 39-13-305(b)(2) provides: "If the offender voluntarily releases the victim alive . . . , such actions shall be considered by the court as a mitigating factor at the time of sentencing."  The record from the sentencing hearing is clear that the trial court found that no statutory mitigating factors applied on the facts of this case.

It appears that the trial court should have applied this mitigating factor in light of the facts of this case.  Defendant eventually allowed the victim to leave the apartment in the morning in order to pick up her paycheck at Logan's, albeit after a lengthy night during which Ms. Head endured repeated assaults and was prevented from leaving the apartment to seek medical attention.  Defendant actually argues that there were multiple occasions during which the trial court could have considered Ms. Head to be "voluntarily released," pointing to the trip for cigarettes and the time Ms. Head spent asleep on the couch.  However, even if the trial court erred by failing to apply this mitigating factor, Defendant is not entitled to relief.  The misapplication of an enhancement or mitigating factor by the trial court "does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005."  *Bise*, 380 S.W.3d at 706; *see also State v. Theotus Barnett*, No. W2012-00048-CCA-R3-CD, 2013 WL 2297128, at *12 (Tenn. Crim. App. May 22, 2013), *no perm. app. filed*.  Defendant's mid-range

sentence is within the appropriate range and complies with the principles and purposes of sentencing. *Id.* at 709-10. Therefore, Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE